## 29208. MUTUAL LIFE INSURANCE COMPANY OF NEW YORK v. RACKLEY.

DECIDED OCTOBER 18, 1941.

*Lawton & Cunningham, F. S. Burney, Louis W. Dawson,* for plaintiff in error.

*Curry & Curry, Lewis & Lewis,* contra.

FELTON, J. James F. Rackley sued the Mutual Life Insurance Company of New York on an insurance policy, to recover payments alleged to be due thereunder by reason of the plaintiff's total and permanent disability, and to recover premiums paid under protest during such alleged disability. The jury found for the plaintiff the sums due to the time of the trial and the premiums paid under

protest. The defendant's motion for new trial was overruled, and it excepted. The only two questions raised are whether the court erred in its charge, and whether the evidence supported the verdict.

1. Exception is taken to the following charge: "I charge you that total disability exists when one is wholly disabled from pursuing the usual and customary duties of his employment on which he must depend for a living. Gentlemen of the jury, I charge you that when the insured is incapacitated from performing any substantial part of his ordinary duties, that he would be totally disabled. Gentlemen of the jury, I charge you that total disability is the inability to do substantially all of the material acts necessary to the transaction of the insured's business or occupation in substantially his customary and usual manner." The assignment of error is. as follows: "The error in said charge being, that, while the charge was a quotation from the Supreme Court's decision in the case of *Cato* v. *Ætna Life Insurance Company*, reported in 164 *Ga.* 392 [138 S. E. 787], the court omitted from said charge the. following: 'Total disability is the antithesis of partial disability. One is the opposite of the other. It follows as a necessary consequence that the insurer is not liable for a total disability when the accident or disease has merely prevented the insured from doing as much in a day's work as before. Such lessened earning capacity may be a case of partial disability, but not a case of total disability;' and the court failed to instruct the jury as to the meaning of the term 'partial disability' and failed to distinguish between 'total' and 'partial' disability. Defendant admitted in its argument to both the court and the jury that the plaintiff was partially disabled, but denied that the plaintiff was totally disabled, and therefore a clear distinction between the meaning of the two terms 'total disability' and 'partial disability' was essential to a proper adjudication of the case."

Assuming for the sake of argument that the assignment is good as an exception that the court failed to charge on an issue in the case, and not that an admittedly correct charge was wrong because it did not contain another principle of law, the judge charged the jury: "Now, gentlemen of the jury, if you find that the plaintiff has carried the burden of proof, that is, that the plaintiff is totally and partially disabled to carry on the usual and customary duties of his employment, on which he depends for a living, and is wholly

and totally disabled, you may find for the plaintiff. . . On the other hand, if you find that he is not wholly and partially . . not partially, wholly disabled or permanently disabled, then you would find for the defendant." The plaintiff: "Your Honor, the court inadvertently used the word 'partially.'" The court: "Gentlemen of the jury, in each of those places totally disregard it. In order to make it clear, in order for the plaintiff to recover he must have been totally and permanently disabled according to the terms of his policy. If he is totally and permanently disabled he would be entitled to recover. If he is not totally and permanently disabled he is not entitled to recover." In view of the correction the charge as a whole sufficiently distinguished between total and partial disability. If further instructions were desired on the subject, they should have been requested. The exception is without merit.

2. The evidence supported the verdict. The jury was authorized to find from the medical testimony that the insured was totally and permanently disabled. Touching his disability, the insured testified substantially that he had been engaged in the business of farming all his life; that just before his illness he had operated thirty-six plows, and used day labor; that he had an attack and was confined to his bed for two months in December, 1938; that he spends half his life in bed; that he had breakfast in bed every morning and usually arose about 9:30 o'clock; that he usually went up town for a few minutes, but not every day; that he usually went to his farm and stayed there from one-half hour to two hours; that he returned home about eleven o'clock, had lunch in bed, and stayed in bed two or three hours after lunch; that he was in bed the first week in January of this year and in bed for over a month in November and December, 1940; that before his illness his normal activities began when he arose at daylight and went to town for a cup of coffee; that he then went to his farm and rang the bell for the hands at a few minutes of sunup; that his first duty was to see that everybody got away from the lot to go to work; that there was usually some matter that needed his attention there or some piece of equipment that needed repairs; that he usually measured his cotton lands by stepping them off; that when his machinery broke down he brought it to town for repairs, and saw to it that the repairs were completed and the machinery in operation again; that he checked the fertilizer used on the farm; that he was able to do

none of these things now; that he gave out the planting seed after weighing them; he measured out the feed for the stock; that for a good many years he drove his reaper and binder, but that he was unable to do it now; that he made what repairs were within his ability, and those he could not make he brought to town; that when the boll-weevil infestation began he made a practice of inspecting his cotton crops daily; that before 1938 he kept the time of his hands and personally supervised them; that at the present time he did not keep the time or supervise them; that before his illness he helped weigh the cotton at night; that he had previously hauled cotton pickers to his farm by driving the car; that he did not drive a car now nor could he ever drive again; that the effort to drive his car caused him to have to go to bed on account of the exertion; that he had had about a dozen chauffeurs; that he did not now weigh his cotton or take it to the gin, and that he did so before his illness; that before January, 1938, he made all the pay rolls, signed all the checks, and paid off the hands; that all this was now done by some one else; that everything that happened on the farm went directly through him; that everything that was purchased for the farm now was bought by some one else and paid for by his wife, who now wrote all the checks and handled all his financial affairs; that when he went to his farm he did discuss the details with his overseers, but that at times there would be intervals of months when he would not go out at all; that he did nothing when he got there, and that since his heart attack he had not walked the distance of the court-house to his home, one block, and never walked anywhere; that he did not fix machinery or weigh cotton; that he did not engage in one-twentieth of the farm activities that he engaged in before his illness, if that much, on account of his inability to do anything; that he occasionally discussed with salesmen or his wife the purchase of some machinery, but that his wife handled all the details and made the purchases, and that he had overseers to operate his farms; that when he now needs fertilizer his overseer tells him what he wants and it is bought by his wife; that when salesmen come to the house he usually is in the bed and hears what is said by them and his wife, but that she handles the details; that his wife and the overseer keep the books; that he smoked, but tried not to smoke a package of cigarettes a day; that before his illness he had been a member of the city council, but attended a meeting for only a few minutes after his heart attack.

Guy Chance testified that he had had dealings with the plaintiff; that the wife of the plaintiff had called him about buying some equipment, and that she did not understand the details, and that he went to the house to explain it to them; that the insured was in the bed at the time he explained it; that he was called later to come by the house to discuss the sale of the tractor; that he took the insured to his farm to look at some mules, and that on arrival at the farm the insured did not get out of the car but directed a hand to get the mules; that the discussions at the house just happened to be in the presence of the insured. D. L. Stone testified that he had done business with the insured for a number of years; that the insured would come to his place of business and try to bargain to obtain better prices; that the insured would actually go into the lumberyard searching for bargains, but that since the illness of the insured he had dealt solely with the wife of the insured and had had no personal dealings with the insured. John T. Palmer testified that he was in the hardware business, and that before the illness of the insured he would have breakfast with the insured at about 5 :30; that at that time the insured would buy his farm equipment himself and attended to all matters touching it; that since 1938 he had had no dealings with the insured in any way. C. W. Skinner testified that before 1938 he had had business dealings with the insured, but that since 1938 all dealings were with the wife of the insured.

The court did not err in overruling the motion for new trial.

*Judgment affirmed. Stephens, P. J., and Sutton, J., concur.*